Filed 7/31/14  In re D.L. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re D.L. et al., Persons Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>R.N. and D.L.,<br><br>        Defendants and Appellants. | A140252<br><br>(Alameda County<br>Super. Ct. Nos. OJ12019205,<br>OJ12019206, OJ12019207,<br>OJ12019949) |

R.N. (Mother), mother of D.L. (D.L. 1), born in 2007, W.W., born in 2008, T.M., born in 2011, and S.M., born in 2012, appeals from the juvenile court's order terminating her parental rights to the children and selecting adoption as their permanent plan.  The fathers of the children—D.L. (Father 1), who is the presumed father of D.L. 1 and the legal father of W.W., and T.M. (Father 2), who is the presumed father of T.M. and S.M.—also appeal from the order terminating their parental rights to their respective children.[1]

---

[1]Mother has one more child, D.L. (D.L. 2), born in 2009, whose presumed father is Father 1.  D.L. 2 was not a party to the proceedings below, and is not a party to this appeal.

1

Mother contends the beneficial relationship exception to termination of parental rights applied. She also joins in Father 1's arguments. Father 1 contends the sibling relationship exception to termination of parental rights applied, and also joins in Mother's arguments. Father 2 joins in Mother's arguments and asserts that if the order terminating parental rights is reversed as to Mother, it should also be reversed as to his parental rights. We reject their contentions and affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 2, 2012, a juvenile dependency petition was filed on behalf of D.L. 1, W.W., and T.M. The petition, as amended, alleged that on June 28, 2012, police responded to a domestic dispute between Father 2 and some of Mother's family members. D.L. 1 was found lethargic and vomiting and W.W. had multiple injuries from suspected child abuse and appeared to be below weight for her age. Mother and Father 2 used corporal punishment as a regular means of discipline and hit D.L. 1 and W.W. with their hands, belts, and a stick. Mother had a history of unstable housing and had placed another child, D.L. 2, with a paternal relative who had since gained legal guardianship of that child. Mother also had a history of leaving her children with various relatives for periods of time, despite suspecting that the relatives were abusing and neglecting the children. Father 2 had mental health issues that impaired his ability to consistently care for the children. He also had a history of yelling, shaking, and striking Mother in the presence of at least one of the children. Father 1 had at least one conviction for possession of cocaine.

The petition further alleged that Father 2 sexually abused W.W and that Mother "reasonably should have known that [W.W.] was in danger of sexual abuse based on [W.W.'s] disclosure . . . . [Mother] also suspected that [W.W.] was the victim of sexual abuse by maternal relatives with whom she allowed contact after becoming aware of the possible abuse." Father 2 also physically abused W.W., who was found with injuries that a medical professional determined were non-accidental, e.g., "circular burns consistent with cigarette burns, scars and lacerations in various stages of healing . . . a hematoma of the lumber spine region, lesions on the skin, and marks on her neck appearing as if

2

someone grabbed her." Mother, by her own admission, knew of the abuse and did not always intervene.

The petition further alleged that Father 2 engaged in acts of cruelty against W.W. Father 2 would "strike [W.W.] with his hands and a stick, whip her with a belt, place a hot sauce-like substance in [her] mouth, have her eat hot peppers, cut her toe with a butter knife, rub soap in her eyes and once placed [her] in the trunk of a car for wetting herself." Mother knew Father 2 was a threat to W.W. and sometimes witnessed the acts but did not intervene. Father 2 and Mother also choked W.W. A medical professional opined that W.W. was tortured over a period of time, "based on the nature and healing stages of her injuries including burns, lesions, scars, bruises and a rib fracture." Father 2 had also abused D.L. 1, and based on the abuse of D.L. 1 and W.W., it was alleged that T.M. was also at substantial risk of being abused.

The petition alleged that the whereabouts of D.L. 1's father were unknown and efforts to identify and locate him had been unsuccessful. Father 1, who was determined to be the biological father of W.W., was incarcerated and could not arrange for the care of the children. According to the petition, Father 1 had served approximately two years of an eight-year prison term. At a July 3, 2012 detention hearing, the juvenile court detained the children and removed them from their home.

In a July 13, 2012 jurisdiction/disposition report, the Alameda County Social Services Agency (Agency) recommended that all three children remain out of the home, with reunification services to Mother, no services to Father 1 because of the length of his anticipated incarceration, and services to Father 2, "should he be made the presumed father [of T.M.]." According to the report, W.W., who had been hospitalized for her injuries, was discharged from the hospital on July 3, 2012, and had joined her siblings in foster care. During a July 6, 2012 interview, W.W. disclosed physical and sexual abuse and reported being choked and having her head placed in the toilet. Criminal records showed that Mother and Father 2 had posted bail and that arraignment was held on July 2, 2012. On July 12, 2012, Father 1 wrote to the social worker requesting that his mother (PGM 1) be allowed to attend the juvenile court proceedings in his place and for

3

D.L. 1 to be placed with her. PGM 1 reported that she had been caring for one of Father 1 and Mother's children, D.L. 2, ever since D.L. 2 was a newborn, and that PGM 1 had received guardianship of him through probate court. Mother had visited D.L. 2 only once. Father 2's mother (PGM 2) reported that she had never observed any mistreatment of the children or of Mother. She believed the problems stemmed from issues on Mother's side of the family.

Mother reported that there was domestic violence between her and Father 2 and that Father 2 had also been abusing W.W. and D.L. 1. Mother stated she no longer wanted to be involved with Father 2 and wished to take parenting classes. She said she attempted to intervene when Father 2 hit W.W. in the face and back with open and closed fists but that Father 2 threatened to kill Mother and choked her. Mother also stated that W.W.'s injuries were caused from falling while she was playing, and from "rug burns." Mother still shared living space with Father 2 but said she was spending the night with him only two days a week. When the social worker met with the children, D.L. 1 voluntarily said he had bruises on his back from playing at the park. W.W. said she also had bruises, and when the social worker asked her how she got them, W.W. initially said "mommy," then stated she fell down. W.W. had many visible marks and bruises, "some of which were oozing blood even from the Band-Aids." W.W. also "appeared awful[ly] thin."

In an October 17, 2012 addendum report, the Agency recommended that no reunification services be provided to Mother and Father 1, and that services be provided to Father 2, "should he be named the presumed father [of T.M.]." According to the report, Mother was engaged to Father 2 and they were expecting their second child together. Mother said there was a stay away order in place protecting W.W. As of mid-September, Mother had almost completed parenting classes but had not contacted Earth Circles for counseling and had not returned calls for a psychological evaluation. She denied any domestic violence and said she and Father 2 only verbally argued. Father 2 would shake her and tell her to shut up, but that only happened during their first year together.

4

Father 2 suffered from various conditions including attention deficit disorder, anger, depression, and insomnia, and was taking a number of medications for those conditions. He reported that he and Mother fought a lot in the first year of their relationship. He denied hitting the children "other than popping their hand and telling them to go to the corner." He added that he did not "deal with [W.W.] at all," and that he and Mother suspected that someone else was touching W.W. because they " 'just knew' something was wrong." Father 2 said that W.W. injured herself when she fell off the scooter, then said she fell down the stairs. When the social worker tried to clarify what had really occurred, Father 2 chuckled and said W.W. was injured when she tried to take her scooter up the stairs and fell. He said W.W.'s head had a large open wound and that he had to hold her head together as he and Mother rushed her to the hospital to get it stitched. He said he noticed scratches and marks all over W.W.'s body and assumed she had been injured when she was with the maternal great grandmother. He reported that W.W.'s arm was burned and blistered because Mother had placed a heat pack on it when the arm appeared swollen, and Mother had forgotten to wrap a towel around the heat pack.

W.W. reported that Father 2 touched her " 'down there' " and told her not to tell anyone. He also put his penis into her vagina, which bled. When he was done, he turned off the television and gave her some cake. W.W. later told Mother what Father 2 had done and she heard Mother talking to Father 2. W.W. also reported that Father 2 hit her with sticks, put her in the shower with her clothes on and rubbed soap in her eyes when he was mad, hit her with a belt on her body, made her eat "nasty" "hot" pickles, and put her in the dark trunk when she was "bad." He also made her put her hands on the wall as he put hot sauce in her mouth and cut her toe with a butter knife. She said that Father 2 "also did that" to D.L. 1 and hit him with a belt. W.W. said that Mother and Father 2 choked her and put her in the closet and closed the door. She reported that on one occasion, Father 2 was "running fast and she was on the scooter; she was tired and fell. [Father 2] hit her in the head, she fell and hit the T.V. and had blood in the head; [Mother] was present for this incident." When the social worker asked W.W. about

keloids she observed on her arm, W.W. said that Mother had hit her on the back with what sounded like a bat. Father 2 also hit Mother and slammed the door on Mother's finger, causing it to bleed. Mother had gone to Highland Hospital " 'a lot of times' " for injuries. W.W. further reported that the maternal great grandparents were nice to her and that they had never hit her or touched her private parts. It took about three times before W.W. would answer questions about "Mommy." She appeared scared, shrugged, and kept rubbing her hands together.

D.L. 1 corroborated W.W.'s story about her being in the trunk of the car. He recalled the police pulling them over because D.L. 1 was not allowed to ride in the front seat, and revealed that W.W. was in the trunk for not apologizing to Mother. D.L. 1 said that Father 2 would get angry at T.M. for crying and would "say bad words to him." Father 2 hit W.W. in the head, pushed her against the dresser, and caused her to bleed. He reported that "Grandma" and "Grandpa" intentionally hurt his eyes when they washed his face.

Supervised visits had begun on August 1, 2012, with one hour set aside for Mother and all three children, and an additional hour for Father 2 and T.M. With the exception of a couple of missed visits, Mother and Father 2 showed up for the visits. On August 7, 2012, a criminal protective order was issued prohibiting Mother from contact with W.W. During the week of September 17, 2012, the parents began having joint visits with the children.[2] The visits generally went well. Father 2 provided snacks and activities and played well with T.M. Mother was more reserved and did not always smile when D.L. 1 approached her. Mother directed most of her attention to T.M. but she grew "more at rest" as time went on. Mother and Father 2 held nice birthday parties for D.L. and T.M. The visitation supervisor observed that D.L. 1 required all of Father 2's attention and would get very upset and cry if Father 2 gave any attention to T.M. For that reason, Father 2 often played with D.L. 1 and Mother spent the majority of her time with T.M. On one occasion, D.L. 1 said to Father 2, "Remember when you used to hit my sister?"

---

[2]Although not entirely clear from the report, it appears that W.W., who was protected by the criminal protective order, was not part of the joint visits.

On another occasion, D.L. 1 said to Father 2, "Daddy, remember when you put my sister in the shower with her clothes?" Father did not respond either time.

The Agency noted that Mother and Father 2 had not acknowledged the physical and sexual abuse and had changed their stories multiple times. Mother had "gone from leaving the relationship and doing whatever it takes to regain the custody of her children to accepting [Father 2's] hand in marriage." The Agency also noted that it "seems unfair that [Father 2] is entitled to services when he was the primary perpetrator in most of the abuse," but nevertheless recommended services for him as to T.M.

In a December 6, 2012 report, the Agency recommended that reunification services be denied for all three parents. The Agency provided a copy of the children's medical records to the parties and included a summary of the records in the report. Mother had given birth to S.M., who was taken into protective custody on November 16, 2012, and placed in the foster home in which his siblings had been placed.[3] Mother and Father 2 had completed their psychological evaluations. Mother stated in a letter to the social worker dated November 24, 2012, that she and Father 2 had "split up," but the social worker stated that although they were living apart, they were still a couple and planned to get married that month. According to the report, PGM 2's home had been approved for placement for T.M. PGM 1's home approval was pending but the Agency was not seeking a change of placement for D.L. 1 and W.W. at the time of the report. Although minors' counsel objected to placing the children in different homes, the Agency noted that a "natural separation" would have to be considered, given that the children had different fathers and different paternal relatives.

At a December 10, 2012 hearing, the juvenile court found Father 1 to be the presumed father of D.L. 1 and the biological father of W.W. The court found services for Father 1 would not be in the best interest of D.L. 1. The court further found that Father 2 was the presumed father of S.M. In January 2013, the Agency reported that Mother had

---

[3]The Agency filed a petition on behalf of S.M. on November 20, 2102, alleging that S.M.'s siblings had been abused or neglected by the parents, and that he was at risk of abuse or neglect. The juvenile court detained S.M.

completed two parenting classes at Family Paths and was attending parenting classes at "the church" twice a week.

At a March 8, 2013 jurisdiction/disposition hearing, the court found true the allegations under Welfare and Institutions Code section 300, subdivisions (b), (g), and (j)[4] and scheduled a permanency hearing under section 366.26 (366.26 hearing). The children were adjudicated dependents of the court and were removed from their parents' custody. The court denied reunification services as to Mother and Father 1.

The Agency stated in its June 7, 2013, 366.26 report that the proposed permanent plan for the children was adoption. The Agency requested a continuance in order to provide proper notice under the Indian Child Welfare Act (ICWA) based on reports by PGM 1, PGM 2, and the maternal great grandmother that their families have Indian ancestry. The Agency provided ICWA notice to—and the notice was received by—the Bureau of Indian Affairs and various tribes. The Cherokee and Blackfeet tribes subsequently responded none of the children were considered an Indian child under the ICWA.

On June 7, 2013, Father 1 filed a modification petition under section 388, seeking to have all of the children placed with PGM 1. On August 20, 2013, the court found a prima facie showing had not been met, and denied Father 1's section 388 petition. The court also found that the ICWA did not apply.

In an August 6, 2013, section 366.26 report, the Agency stated that it believed all four children were adoptable. The foster parents for all four children wanted to adopt them, and PGM 1 and her husband (together, Father 1's parents) had expressed interest in adopting the children. According to the report, the children were healthy with no diagnosed medical, developmental, mental, or emotional issues that would preclude them from being adopted. The Agency planned to conduct an adoption home study for Father 1's parents.

---

[4]All further statutory references are to the Welfare and Institutions Code.

The Agency reported that visitation was going well. D.L. 1 liked to monopolize Father 2's attention, so Mother played more with T.M., while giving attention to D.L. 1 by asking him about school and reading to him. During one visit, D.L. 1 talked about sharing a story at school about how Father 2 had hurt him. When Mother asked what else he had shared at school, D.L. 1 refused to continue, saying, "I can't tell you. I don't want to get in trouble or make Daddy mad."

The case moved to an adoption program in April 2013. A child welfare worker who supervised four visits reported that Father 2 spent most of his time with the older boys but also comfortably held S.M. towards the end of the visit. When D.L. 1's play became "a little worked up," Father 2 was able to redirect him. Mother held S.M. for most of the visit but interacted with the older boys by opening their drinks, talking to them, and changing T.M.'s diaper. At the other visits, the parents divided their time more equally among the three boys. Mother came prepared to a May 1, 2013 visit with snacks for all of the children and also brought a snack to be taken home to W.W. She supervised all three children well, kept D.L. 1 engaged, and was able to redirect him when necessary. She held S.M. throughout the visit while making sure T.D. did not hurt himself. At other visits, the parents were affectionate with the children and were able to set limits when needed.

Father 1's parents had been visiting weekly with W.W. since March 2013. D.L. 1 joined the visitation in June 2013 and T.M and S.M joined in July 2013. W.W. "present[ed] with lots of generalized anxiety" at the visits and was "hyper vigilant, often asking 'why are you looking at me like that' or 'why are you laughing at me' when people were laughing but not at her." She also responded to minor redirection with, "do you want me to go under the table?" and "you want me to go under the table." D.L. 2 participated in some visits and the children played well together. W.W. did not talk about Mother or Father 1 at all but referred to her caregivers as her mothers. W.W. appeared friendly but not affectionate with Father 1's parents.

According to an addendum report filed October 15, 2013, Mother had attended all scheduled visits with D.L. 1, T.M., and S.M. since July. The visits generally went well.

Both parents changed T.M. and S.M.'s diapers.  There was a lot of focus on food during the visits, as the parents brought drinks and snacks for the boys, and Father 2 had a ritual of getting a snack from the machines with T.M.  On August 27, 2013, the family celebrated T.M.'s second birthday with treats and presents.  On October 2, 2013, the parents brought cake for D.L. 1's sixth birthday and promised him presents the following week after Father 2 got paid.  The Agency also reported that in late August 2013, W.W. and one of her foster mothers were at a store when they saw Mother.  W.W. ran to Mother, and the foster mother allowed W.W. and Mother to greet each other.  This was the only contact W.W. had with Mother since August 2012 because of the criminal court's stay away order.

According to the report, PGM 1 stated that the visits with the children were going "great" and that they did not want to leave at the end of visits.  D.L. 1 was enjoying the company of D.L. 2, and another paternal half-brother had also visited while the children were at the home.  The visits were going so well that the foster parents allowed D.L. 1 and W.W. to spend the night, and all four children had been spending Saturday morning to Sunday evening at Father 1's parents home.  The foster mother reported that the visits were going "okay" and that W.W. had told her she does not like it when PGM 1 says "shut up."  W.W. had also reported that PGM 1 had told "her grandson that if he urinated outside again 'she would whoop him.' "  W.W. was enjoying the visits, and D.L. 1 also appeared to enjoy the visits, although he had indicated that he wanted to visit, but not live, with Father 1's parents.  According to the report, W.W. also reported to her foster parents that during a visit with Father 1's parents on the weekend of October 5 to 6, 2013, PGM 1 used a belt to " 'whoop' " T.M. and another toddler in the home.  A child welfare worker spoke to PGM 1, who said she did not, and would not, hit any of the children.  Although the children were enjoying their visits at Father 1's parents home, the Agency stated it would continue to closely monitor visits and the children's behaviors, based on "the behavioral regressions being experienced, and [W.W.'s] reports regarding physical punishment."

At the section 366.26 hearing on October 29, 2013, Mother testified she had regular visitation with the boys once a week, and that when the boys first see her they call her "mom." Mother testified that she brought them treats, chips, juice, gifts, books and flash cards, and would play with them, laugh with them, talk with them, read to them, feed them, and change the younger children's diapers. If one of the boys misbehaved, she would sit him on the couch and make him stay there. She kept them all safe by not allowing them to climb on things or run too quickly. The boys told her they loved her all the time, and they got sad and sometimes cried at the end of visits.

Mother testified that she saw W.W. one time when she was out in the community, and that W.W. ran up to her, gave her a big hug, and said, "[h]i, Mom." Mother testified that she had completed the parenting class at Family Path, and that she had been in therapy until she had transportation issues. She had asked the Agency for increased visits, unsupervised visits, and visits out in the community, but her requests were denied.

Father 2 testified he visited the boys once a week. He brought them toys and money to buy things from the vending machines. He celebrated T.M.'s birthdays with him during visits, and T.M. called him "Dad." When T.M. first saw him, he would run to Father 2, call him "Dad," and give him a hug and kiss. At the end of visits, they would have a group hug and kiss, and Father 2 would tell the children that he would see them next week. Father 2 further testified that S.M. would have a big smile on his face at the beginning of the visits and would give him hugs and kisses during the visits. Father 2 changed S.M.'s diaper at every visit. Father 2 had completed parenting classes and was currently taking his medication.

Father 1 appeared telephonically and testified that D.L. 1 and W.W. had been visiting their brother D.L. 2 at Father 1's parents' home for the past two months. Father 1 believed that D.L. 1 and W.W. had a relationship with D.L. 2 and testified that he wanted PGM 1 to be considered for placement of all four children. Father 1 was scheduled to be released from prison in April 2015. He planned to get himself together after his release, before having D.L. 1 and W.W. live with him.

11

At the end of the section 366.26 hearing, the juvenile court found by clear and convincing evidence that the children were adoptable and that no exception to termination of parental rights applied. The court ordered that parental rights be terminated and sent the matter to mediation for post-adoptive and sibling contact.

## DISCUSSION

### *Beneficial Relationship Exception*

Mother contends the juvenile court erred in terminating parental rights because the beneficial relationship exception to termination of parental rights applied.[5] We disagree.

To determine whether the beneficial relationship exception applies, the juvenile court "balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) The beneficial relationship exception is "difficult to make in the situation, such as the one here, where" mother has not "advanced beyond supervised visitation." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) The beneficial relationship exception "may be the most unsuccessfully litigated issue in the history of law. . . . [I]t is almost always a loser." (*In re Eileen A.* (2000) 84 Cal.App.4th 1248, 1255, fn. 5, disapproved on other grounds in *In re Zeth S.* (2003) 31 Cal.4th 396, 413–414.)

Here, the court determined the beneficial relationship exception did not apply because any benefit in maintaining the parental relationship was outweighed by the "need for permanence of these children, who have been in one setting for 15 months, and [where] the oldest child says that he wants to remain in that setting." This determination

---

[5]As noted, both fathers join in Mother's arguments. Because the fathers do not separately argue that the benficial relationship exception applied to them, we address only Mother's relationship to the children.

was not an abuse of discretion. (*In re K.P.* (2012) 203 Cal.App.4th 614, 621–622.)[6] The evidence showed that Mother often left the children with other relatives, even when they were in her custody. The maternal great grandmother, for example, reported that she took care of D.L. 1 and W.W. for various periods of time while Mother tried to get back on her feet. Further, T.M. lived with Mother for only ten months before being taken into protective custody, and S.M. was taken into protective custody shortly after his birth. Although Mother visited the children regularly and was appropriate with them, she had failed to show she was able to meet the children's need for permanency, safety, stability, consistency, and structure. She remained in denial about the reasons the children became court dependents. She denied using physical discipline on the children and changed her story multiple times as to whether Father 2 hit her or the children. She continued her relationship with Father 2 and was engaged to be married to him, despite his history of abusing her and her children. There was a criminal protective order in place protecting W.W. from abuse, which resulted in Mother having only one visit with W.W. during the proceedings. In light of Mother's history of abuse and her failure to make progress as a parent to meet the children's needs, the juvenile court properly found that the beneficial relationship exception to termination of parental rights did not apply.

Mother's argument that she raised the children until they were removed from her care, and that her visits with them were positive, "consistent and regular," does not persuade us that the juvenile court abused its discretion. (See *In re C.F.* (2011) 193 Cal.App.4th 549, 555–556 [pleasant visits between the mother and the child, and the child's sadness at the end of some visits, did not establish beneficial relationship exception].) To establish the beneficial relationship exception, Mother was required to

---

[6]"For years California courts have diverged in their view about the applicable standard of review for an appellate challenge to a juvenile court ruling rejecting a claim that an adoption exception applies. Most courts have applied the substantial evidence standard of review to this determination" and at least one court "concluded that it is properly reviewed for an abuse of discretion." (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 621.) We conclude that in this case, there was no error even under the more deferential abuse of discretion standard.

show "more than that the relationship [with the children] is 'beneficial.' " (*In re Casey D., supra*, 70 Cal.App.4th at p. 52, fn. 4.)  She needed to demonstrate her relationship with the children promoted their well-being " 'to such a degree as to outweigh the well-being [they] would gain in a permanent home with new, adoptive parents.' " (*Ibid*., quoting *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1342.)  Mother failed to do so.

## Sibling Relationship Exception

Father 1 contends the sibling relationship exception to termination of parental rights applied because D.L. 1 and W.W. had a significant sibling relationship with D.L. 2. We disagree.

The sibling relationship exception applies in cases where it would be detrimental to the child to terminate parental rights because:  "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption."  (§ 366.26, subd. (c)(1)(B)(v).)  The application of this exception "will be rare, particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount." (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014.)  As such, the party opposing adoption has a "heavy burden" in showing the sibling relationship exception applies. (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.)  "Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended.  If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship."  (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952, fn. omitted.)

Here, considering the nature and extent of D.L. 1 and W.W.'s relationship with D.L. 2, we cannot conclude their relationship would face substantial interference if the

permanent plan of adoption were implemented. Rather, the record reflects only that the children enjoyed each other's company and often did not want to leave at the end of visits. There was little, if any evidence that they had significant common experiences or a close and strong bond, or that their long-term emotional well being was at stake if their visits were to be discontinued. The children had never lived together, were not raised by the same parents or guardians, and had likely not seen each other much, if at all, before they began visiting as part of the dependency proceedings. These circumstances undermine any finding that the siblings had such a strong relationship that terminating parental rights would be detrimental to them.

In any event, "even if a sibling relationship exists that is so strong that its severance would cause the child detriment, the court then weighs the benefit to the child of continuing the sibling relationship against the benefit to the child adoption would provide." (*In re L.Y.L.*, *supra*, 101 Cal.App.4th at pp. 952–953.) Here, for all the reasons set forth above, the record supports the juvenile court's finding that returning D.L. 1 and W.W. to Mother or Father 1 would be detrimental, and that adoption was in their best interest. The rather scant evidence of a bond between D.L. 1 and W.W. and D.L. 2 simply did not outweigh the benefit D.L. 1 and W.W. would gain by the stability and permanency of adoption.

## DISPOSITION

The order is affirmed.

_____
McGuiness, P.J.


We concur:


_____
Siggins, J.



_____
Jenkins, J.

15